RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0158P (6th Cir.)
File Name: 01a0158p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,
   *Plaintiff-Appellee,*

  *v.*
         Nos. 99-6176/6198

JOHN M. LOGAN (99-6176);
ALAN MICHAEL LAWS
(99-6198),
   *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 96-00017—James H. Jarvis, District Judge.

Argued: January 31, 2001

Decided and Filed: May 11, 2001

Before: MARTIN, Chief Judge; COLE, Circuit Judge;
NUGENT, District Judge.[*]

───────────────

[*]The Honorable Donald C. Nugent, United States District Judge for the Northern District of Ohio, sitting by designation.

---

**COUNSEL**

**ARGUED:** Jerry W. Laughlin, ROGERS, LAUGHLIN, NUNNALLY, Greeneville, Tennessee, Robert W. Ritchie, RITCHIE, FELS & DILLARD, Knoxville, Tennessee, for Appellants. M. Neil Smith, ASSISTANT UNITED STATES ATTORNEY, Greeneville, Tennessee, for Appellee. **ON BRIEF:** Jerry W. Laughlin, ROGERS, LAUGHLIN, NUNNALLY, Greeneville, Tennessee, Robert W. Ritchie, W. Thomas Dillard, RITCHIE, FELS & DILLARD, Knoxville, Tennessee, for Appellants. M. Neil Smith, ASSISTANT UNITED STATES ATTORNEY, Greeneville, Tennessee, for Appellee.

---

**OPINION**

---

NUGENT, District Judge. Appellants John M. Logan and Alan Michael Laws were found guilty by a jury sitting in the United States District Court for the Eastern District of Tennessee on ninety-four counts of criminal charges, which included making false statements, false entries, false claims, and one count of conspiracy. Appellants filed a timely notice of appeal to this Court, challenging their convictions and the corresponding sentences. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 to review the final judgment of the district court and pursuant to 18 U.S.C. § 3742(a) to review the sentence imposed. For the reasons set forth below, we hereby AFFIRM the judgment reached and sentences imposed by the district court.

**I. BACKGROUND**

Appellants in this case are the sole shareholders and controlling officers of Logan-Laws Financial Corporation ("LLFC"), an entity which made mortgage loans co-insured by the Federal Housing Administration of the Department of

district court did not err in denying Appellants' motion for permission to interview the jurors. Accordingly, we shall not reverse the lower court on this basis.

### III. CONCLUSION

For the reasons stated herein, we AFFIRM the judgment reached and the sentences imposed in the court below. More specifically, we hold that the district court did not err in finding that the search warrant executed by the government of LLFC's premises was not a general warrant in violation of the Fourth Amendment. In addition, the district court properly held that there was sufficient evidence to find Appellants guilty of making false claims, false entries or false statements, and conspiracy. Furthermore, the district court did not err in admitting evidence of a settlement agreement between HUD/FHA and LLFC and evidence of Appellants' reported taxable income. As to sentencing, we find that the district court did not err in calculating loss, in refusing to depart downward from Appellant Laws's sentencing computation, in enhancing Appellants' sentences for obstruction of justice, and in calculating Appellant Laws's criminal history category. Finally, we hold that the district court did not err in refusing to allow counsel for Appellants to conduct a post-verdict interrogation of jurors concerning alleged jury misconduct that took place during the trial.

Housing and Urban Development ("HUD/FHA"). Through LLFC, Appellants issued securities backed by pools of federally insured mortgages to secondary market purchasers under the Government National Mortgage Association's ("GNMA's") mortgage-backed securities program ("MBS program"). As an issuer of securities under the MBS program, LLFC was required to collect monthly principal and interest payments from property owners, which it passed through to the security holders, less servicing fees. In the event that a property owner failed to make a monthly payment, LLFC's role as a HUD/FHA co-insured lender required it to pay security holders from its own funds. If LLFC failed to make such payments, GNMA guaranteed payment to the security holders. Thus, the United States, through GNMA, was ultimately responsible for the timely payment of principal and interest due on LLFC's mortgage-backed securities.

In connection with this practice, a grand jury returned a ninety-six count Indictment against Appellants, charging them with conspiring to defraud and commit offenses against the United States; making false claims to HUD/FHA; making false entries in reports to GNMA; making false statements to GNMA; and wire fraud. Prior to trial, one count of making false claims to HUD/FHA and the wire fraud count were dismissed. A jury convicted Appellants on each of the remaining Counts in the Indictment. Pursuant to the United States Sentencing Guidelines (the "Guidelines"), the district court sentenced Appellants to serve eighty-seven months of imprisonment, to be followed by three years of supervised release. In addition, the district court ordered Appellants to make restitution to HUD/FHA and GNMA in the amount of one million dollars.

In this Court, Appellants challenge both their convictions and sentences. More specifically, Appellants raise the following issues: (1) whether the search warrant executed by the government of LLFC's premises was a general warrant in violation of the Fourth Amendment of the United States Constitution; (2) whether there was sufficient evidence to find

Appellants guilty of false claims; (3) whether there was sufficient evidence to find Appellants guilty of false entries or false statements; (4) whether there was sufficient evidence to demonstrate that there was a knowing and willing agreement between Appellants to commit a crime; (5) whether the district court erred in admitting evidence of a settlement agreement between HUD/FHA and LLFC; (6) whether the district court erred in permitting the government to inquire as to Appellants' reported taxable income; (7) whether the district court incorrectly calculated loss under the Guidelines; (8) whether the district court improperly refused to depart downward from Appellant Laws's sentencing computation under the Guidelines; (9) whether the district court erred by enhancing Appellants' sentences for obstruction of justice; (10) whether the district court incorrectly calculated Appellant Laws's criminal history category under the Guidelines; and (11) whether the district court improperly refused to allow investigation of alleged jury misconduct. The Court considers each of these issues below.

## II. DISCUSSION

The issues raised on appeal in this case generally fall into three categories. First, Appellants challenge the sufficiency of the evidence leading to their convictions. Next, Appellants assert that the district court erred in making several material evidentiary rulings. Finally, Appellants raise various challenges to the post-trial rulings made in the court below. We consider these categories in turn.

### A. Sufficiency of the Evidence

In considering claims for sufficiency of the evidence to support a conviction, this Court, while reviewing the record in the light most favorable to the prosecution, should grant relief only if it is found that upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

court *before* they render a verdict. Finally, after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct.

*Id.* (emphasis in original) (internal citations omitted). Thus, there exist various sources of protection built into the legal system which protect the defendant's constitutional rights throughout the trial process. *See id.* Hence, the entire process, including Rule 606(b), is designed to balance the integrity of the jury system against the rights of the defendant. *See id.*

Against this backdrop, a court facing post-verdict allegations of jury misconduct shall rely on the essence of Rule 606(b), which provides that if the case involves an extraneous or external influence on the jury, then a post-verdict interrogation of jurors is permitted in order to adequately protect the defendant's constitutional rights. *See id.* Conversely, if the case involves an internal influence, the Rule does not permit the post-verdict interrogation of jurors. In the latter instance, the preservation of the integrity of the jury system outweighs any potential violation of the defendant's constitutional rights. *See id.* In this way, the internal influence versus external influence distinction in the Rule is designed to balance the preservation of the integrity of the jury system and the rights of the defendant.[2] *See id.*

In the instant case, the alleged jury misconduct consisted of potentially premature deliberations that occurred during the course of the trial. The district court correctly determined that this alleged misconduct constituted a potential internal influence on the jury. Because Rule 606(b) prohibits post-verdict interrogation of jurors as to internal influences, the

---

[2] *But see Doan v. Brigano*, 237 F.3d 722, 722 (6th Cir. 2001). In that case, a panel of this Court framed the issue in terms of whether an application of Rule 606(b) violated the defendant's constitutional rights, as opposed to relying on the internal versus external influence distinction built into the Rule to preserve the integrity of the jury as well as the rights of the defendant.

Based upon the foregoing, it is clear that the very purpose behind Rule 606(b) is to preserve one of the most basic and critical precepts of the American justice system: the integrity of the jury. *See id.* Rule 606(b) allows for a system in which jurors may engage in deliberations with the utmost candor, performing in an uninhibited way the fact-finding duties with which they are charged. *See id.* In this manner, the Rule provides jurors with an inherent right to be free from interrogation concerning internal influences on the decision-making process. *See id.* Such internal influences have been held to include pressure of one juror on another, *see Smith v. Brewer*, 444 F. Supp. 482 (S.D. Iowa 1978); juror misunderstanding of court instructions, *see United States v. D'Angelo*, 598 F.2d 1002 (5th Cir. 1979); a verdict achieved through compromise, *see United States v. Campbell*, 684 F.2d 141 (D.C. Cir. 1982); juror misgivings about the verdict, *see United States v. Barber*, 668 F.2d 778 (4th Cir. 1982); and juror agreement on a time limit for a decision, *United States v. Badolato*, 710 F.2d 1509 (11th Cir. 1983). Accordingly, Rule 606(b) prevents the unwarranted badgering of jurors that would invariably arise in its absence in an alleged attempt to search for the "truth" as to the manner in which each and every jury reaches a verdict. *See Tanner*, 483 U.S. at 119-27.

Moreover, Rule 606(b) does not exist in a vacuum. *See id.* at 127. To the contrary, the Rule exists as just one portion of the overall justice system, which is likewise designed to protect the constitutional rights of the defendant, including the defendant's Sixth and Fifth Amendment rights to a fair trial and an impartial jury under the Constitution. *See id.* In this regard, the Supreme Court has stated, for example:

> Petitioners' Sixth Amendment interests in an unimpaired jury . . . are protected by several aspects of the trial process. The suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire*. Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel. Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the

### 1. False Claims Convictions

On appeal, Appellants argue that the evidence presented at trial was insufficient to support their convictions for making, or causing to be made, false HUD/FHA loan insurance claims under 18 U.S.C. § 287. Appellants contend that the false claims counts were based upon submission of either a Verification of Employment form ("VOE") or a Verification of Deposit form ("VOD"), neither of which satisfies the materiality requirement present in the false claims statute. Thus, Appellants argue that these forms, even if false, did not render the claims "false" within the meaning of the statute because the required element of materiality remains unsatisfied.

This Circuit first addressed the particular issue of whether materiality is an element of a false claims offense in *United States v. Nash*, 175 F.3d 429, 433-34 (6th Cir. 1999). As in this case, the appellant in *Nash* argued that materiality is an element of this offense, and that because the government failed to prove that his statements were material, no rational trier of fact could find him guilty beyond a reasonable doubt of making false statements. *Id.* at 433.

In determining whether materiality was an element of the false claims statute in *Nash*, this Court first looked to the plain language of 18 U.S.C. § 287. That language provides:

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

*Id.* Based upon that section, this Court noted that the plain language neither mentions materiality nor in any way implies that the claim must be material. *Nash*, 175 F.3d at 434. Furthermore, we recognized that: (1) reading materiality into

the statute would make surplusage of Congress's explicit use of the term in other statutes; (2) the legislative history of § 287 does not indicate that Congress intended to make materiality a necessary element of the statute; and (3) the requirement of materiality "would set up an incongruous 'heads I win, tails you lose' dichotomy." *Id.* This being the case, we made clear in *Nash* that the Sixth Circuit joined the Second, Fifth, Ninth, and Tenth Circuits in finding that materiality is not an element of 18 U.S.C. § 287. *Id.* On this basis alone, we find Appellants' argument concerning insufficiency of the evidence as to the false claims convictions to be entirely without merit. Under the law of this Circuit, materiality is not an element of an offense arising under 18 U.S.C. § 287.

Moreover, even if materiality were to be considered an element of this offense, the evidence was still sufficient to support Appellants' convictions under 18 U.S.C. § 287. That is, in light of the fact that the trial in the instant case took place pre-*Nash*, the jury was charged that materiality was required.[1] The jury found that the false VOEs and VODs were, in fact, material to HUD/FHA's decision concerning whether to pay particular claims upon default. The record reveals that claims manager James Gibson testified at trial that the VOEs and VODs for the relevant claims were fraudulent. More specifically, Mr. Gibson explained that he, Appellants, or other LLFC employees forged the documents to make the loan files acceptable to HUD/FHA for payment on the loan insurance claims. J.A. at 1711-56. Furthermore, Allen Stailey, a marketing and outreach specialist for HUD,

---

[1]Specifically, the district court charged that the elements of 18 U.S.C. § 287 are as follows:

(1) that the defendant made or presented or caused to be made or presented to HUD a claim against the United States; (2) that at the time of this claim, HUD was a department or agency of the United States; (3) that the claim presented was fictitious or fraudulent in that the loan insurance claim contained false documents that were material to the claim; and (4) that the defendants knew that the claim was false, fictitious, or fraudulent. J.A. at 2223.

in the language of the Rule, exceptions are made only with respect to extraneous prejudicial information improperly brought to the jury's attention and evidence concerning an outside influence brought to bear upon any juror.

In *Tanner v. United States*, 483 U.S. 107, 116-34 (1987), the Supreme Court provided a detailed examination of Rule 606(b) in upholding the lower court's exclusion of evidence offered by two jurors regarding the other jurors' alleged use of drugs and alcohol during the course of the trial. In reaching the conclusion that the influence at issue was internal in nature, rather than external in nature, and consequently not properly a subject for questioning of the jurors pursuant to Rule 606(b), the Supreme Court explained that public policy considerations have long emphasized the necessity of shielding jury deliberations from public scrutiny. *Id.* at 119. In this regard, the Supreme Court referred to the 1915 decision of *McDonald v. Pless*, 238 U.S. 264, 267-68, which stated:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.

*Id.* at 119-20 (citing *Mattox v. United States*, 146 U.S. 140 (1892)). Thus, the Supreme Court recognized the various public policy considerations that weigh in favor of protecting a jury's deliberations from intrusive inquiry as to internal influences. *Id.* at 127.

order. Appellants now raise this issue concerning the alleged jury misconduct before this Court.

It is a well-established principle of law that trial judges are afforded considerable discretion in determining the amount of inquiry necessary, if any, in response to allegations of jury misconduct. *See United States v. Griffith*, 17 F.3d 865, 880 (6th Cir. 1994); *United States v. Franks*, 511 F.2d 25 (6th Cir. 1975). We have thus recognized that because "the trial judge is in the best position to determine the nature and extent of the alleged jury misconduct, his decision on the scope of the proceedings necessary to discover misconduct is reviewed only for an abuse of discretion." *See Griffith*, 17 F.3d at 880 (quoting *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th 1985)). In cases involving a post-verdict investigation into alleged jury misconduct, the relevant federal law concerning the impeachment of jury verdicts is codified in Rule 606(b).

Rule 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b). Accordingly, the Rule is designed to prohibit testimony on matters that take place during deliberations, the effect of anything on the juror's minds or emotions, and the mental process of any juror. As provided

testified that because the program is primarily based on the creditworthiness of the borrower, it is critical that the lenders follow procedures and that they are truthful in the verification of employment and deposit information so that HUD/FHA can determine whether to pay on a particular claim. J.A. at 1779. Based upon this testimony, it was reasonable for the jury to conclude, as it did, that the contents of the VOEs and VODs were material to the HUD/FHA's decision as to whether to pay particular claims.

Appellants make much of the fact that neither the applicable regulations governing approval by a lender of a loan, nor the regulations governing the submission of a claim, specifically require that a VOE or VOD form be used or submitted. This technical argument amounts to nothing more than an unsuccessful attempt to circumvent the inevitable conclusion that Appellants submitted false documents in order to induce HUD/FHA to pay on certain loan insurance claims, regardless of the manner in which such information was submitted. In viewing the record in the light most favorable to the prosecution, the Court finds that the evidence adduced at trial was such that a rational trier of fact could have found proof of guilt beyond a reasonable doubt. For the above-stated reasons, the Court finds Appellants' argument concerning insufficiency of the evidence with respect to the false claims convictions to be without merit.

## 2. False Entries and False Statements Convictions

Appellants next assert that there was insufficient evidence adduced at trial upon which a rational jury could find them guilty of the offense of making false entries in reports under 18 U.S.C. § 1006. Similarly, Appellants argue that there is insufficient evidence to support a conviction for making false, fictitious, or fraudulent statements concerning material facts within the jurisdiction of GNMA in violation of 18 U.S.C. § 1001. The Court considers these arguments in turn.

Section 1006, entitled "Federal Credit Institution Entries, Reports and Transactions," provides, in pertinent part, the following:

Whoever, being . . . connected in any capacity with the . . . Department of Housing and Urban Development . . . with intent to defraud [the] institution . . . or to deceive any officer, auditor, examiner or agent of [the] institution, . . . makes any false entry in any book, report or statement of or to any such institution, or without being duly authorized, draws any order or bill of exchange, makes any acceptance, or issues, puts forth or assigns any note, debenture, bond or other obligation . . . or, with intent to defraud the United States or any agency thereof . . . participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1006.  Thus, the offense of making false entries under § 1006 requires that Appellants, while officers, agents, or employees of a lending corporation, acting pursuant to federal law and in a capacity connected with the GNMA of the HUD, with the intent to defraud such agencies, knowingly and willfully made or caused to be made false entries in reports to them.

In the instant case, the government alleged at trial that Appellants made false entries in Form 11710A reports, which provided information on pools of loans; in Form 11710D reports, which summarized all of the pools that LLFC issued during its existence; and in letters from Appellant Logan to Guy Wilson, a Vice-President of GNMA, which repeated the information represented in the 11710A and 11710D forms. J.A. at 358.  Appellants do not dispute the fact that, as an authorized Title I lender, LLFC was required to submit monthly reports to GNMA reflecting the status of each borrower's account on a Form 11710A and a Form 11710D. As in the court below, however, Appellants argue that the forms and letters were not false because the payments reflected therein were actually made to the borrowers' accounts, regardless of the fact that they were paid out of

In the instant case, [Appellant] Laws did not allege any juror misconduct during the trial, and does not allege any now.  The defendant's motion and supporting brief provide no grounds upon which post-verdict interrogation should be granted, except to note that only by communicating with the jurors could defendant's counsel discover if there had been any external influences on jurors.  The same is true of every case, however, and granting defendant's motion on these grounds alone would potentially open up any jury verdict to impeachment.

J.A. at 370-71.  Finding that a grant of the motion would give rise to an improper fishing expedition through which Appellant sought to undermine the integrity of the jury verdict, the district court denied the request for permission to interrogate the jurors.  J.A. at 371.

In response to the district court's ruling, Appellant Laws filed a motion to alter or amend the court's order denying permission to interview the jurors. J.A. at 372. In this second motion, counsel for Appellant Laws explained that during his communication with a juror, he learned that the jury routinely discussed evidence among themselves during the course of the entire trial, thereby effectively deliberating prior to the close of the evidence and prior to being advised of the appropriate jury instructions.  J.A. at 373.  Based upon this allegation of jury misconduct, Appellant Laws argued that he should be permitted to investigate the situation, which may have given rise to a violation of his Sixth and Fifth Amendment rights to a fair trial and an impartial jury under the Constitution.  J.A. at 373.  Furthermore, counsel for Appellant Laws, Robert W. Ritchie, attached his sworn affidavit in support of the motion.

Thereafter, Appellant Logan filed a "motion to adopt defendant Law's [sic] pending motion to alter or amend [the] July 14, 1999 order denying permission to interview jurors." On July 19, 1999, the district judge denied Appellants' motion to alter or amend its prior ruling in a marginal entry

Amendment privilege reflects that the district court properly assessed one criminal history point for the 1987 DUI conviction pursuant to § 4A1.1.(c) of the Guidelines. For these reasons, we find that the district court did not err in computing Appellant Laws's criminal history category.

### 5. Investigation of Alleged Jury Misconduct

Finally, Appellants contend that the district court erred in denying a motion filed by Appellant Laws for permission to communicate with jurors. In the motion, Appellant Laws stated that "after the jurors in this case were released from further jury service, counsel for Mr. Laws . . . had a communication with a juror in this case, but did not feel that further communication should be had without permission of the Court." J.A. at 367. Out of a purported abundance of caution, therefore, Appellant Laws requested permission to interrogate the jurors. J.A. at 367.

In considering the motion filed by Appellant Laws, the district court first recognized the existence of Local Rule 48.1 for the Eastern District of Tennessee, which governs post-verdict communications with jurors. J.A. at 367. It provides that:

> No attorney, party, or representative of either may interrogate a juror after a verdict has been returned or the trial has been otherwise concluded, without prior permission of the court.

J.A. at 367 (quoting L.R. 48.1 (E.D.Tenn.)). The district court also acknowledged that Rule 606(b) further circumscribes the practice of post-verdict inquiries, by stating that jurors may testify only as to whether extraneous prejudicial information was improperly brought to their attention or whether any outside influence was improperly brought to bear upon any juror. J.A. at 370. In light of these standards, and in addition to the relevant case law, the district court made the following determination:

LLFC's own funds. On this basis, Appellants contend that the reports accurately reflect that a payment had been made and, therefore, were not false.

In *United States v. Walker*, 871 F.2d 1298, 1308 (6th Cir. 1989), this Circuit made clear that "[a] statement may be false when it contains a half truth or when it conceals a material fact." In that case, we were faced with a similar situation, in which the appellant argued that the entries were not false because they recorded actual transactions as they occurred. *Id.* Nevertheless, the government "alleged and proved that the entries at issue were false because they failed to disclose that the loans were not made for the benefit of the named borrower and that the named borrower had not made the interest payments with his own funds." *Id.* On this basis, we upheld the false entries convictions. *Id.*

Here, the GNMA guidelines establish that the reports in question are required to reflect the payments that were actually received from the borrowers. According to the testimony presented at trial, GNMA requires lender reports to reflect actual payments from borrowers and the loan delinquency information because it needs to obtain a complete picture of how many loans were delinquent and how such delinquency affected the lender's cash flow. J.A. at 1512A-1512B. In this way, GNMA is able to gauge the risk that it is undertaking with respect to each lender, and it is able to determine whether to allow the lender to continue participating in the program. *Id.* at 1512B. If the lender masks the number of delinquent loan payments by making the payments from its own funds, and thereby classifies such payments as actually received, the effect would be to deprive GNMA of the mandatory information it requires to assess continued relations with the lender. The record reflects that each witness who testified about the propriety of a lender making payments to the accounts of delinquent borrowers, with the exception of Appellants, explained that such a practice was not permitted pursuant to the GNMA guidelines and would have been done only to deceive GNMA about the lender's true loan delinquency rates. J.A. at 359. Viewing

the record in the light most favorable to the prosecution, we find that the record evidence adduced at trial could have led a rational jury to find guilt beyond a reasonable doubt as to the false entries convictions.

Similarly, Appellants challenge their convictions for making false statements pursuant to 18 U.S.C. § 1001. That statute provides in part:

> whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully –
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
> shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1001. In order to establish a violation of 18 U.S.C. § 1001, the government must demonstrate that: (1) the defendant made a statement; (2) the statement is false or fraudulent; (3) the statement is material; (4) the defendant made the statement knowingly and wilfully; and (5) the statement pertained to an activity within the jurisdiction of a federal agency. *See United States v. Rogers*, 118 F.3d 466, 470 (6th Cir. 1997). A statement is material under § 1001 if it has the natural tendency to influence, or is capable of influencing, the federal agency. *See United States v. Lutz*, 154 F.3d 581, 588 (6th Cir. 1998).

In this case, the statements at issue relate to letters from Appellants to Guy Wilson relating to LLFC's "DQ ratios." The DQ ratios are "an indicator of the loan delinquencies for a GNMA issuer's loan portfolio and were used by GNMA to determine whether authority to issue additional GNMA-guaranteed securities would be granted." J.A. at 360. These

### 4. Criminal History Computation

We now consider the argument that the district court incorrectly calculated Appellant Laws's criminal history category under the Guidelines. More specifically, Appellant Laws states that the district court incorrectly assessed one criminal history point for a driving-under-the-influence ("DUI") conviction that took place on April 7, 1987. Appellant Laws argues that because he was not represented by counsel on this misdemeanor charge, and the conviction resulted in a sentence of imprisonment, it should not have been included in his criminal history computation.

In support of this position, Appellant Laws relies principally upon *Nichols v. United States*, 511 U.S. 738 (1994). He argues that *Nichols* indicates that a sentencing court may consider a defendant's previous uncounseled misdemeanor conviction for DUI only if the previous uncounseled misdemeanor did not result in a sentence of imprisonment. Because a sentence of imprisonment was imposed with respect to his 1987 conviction, Appellant Laws asserts that this offense should not be included in calculating his criminal history category. We find Laws's use of *Nichols* here to be misplaced.

The *Nichols* case established the rule that uncounseled misdemeanor convictions are properly included when determining a defendant's criminal history category only if the convictions did not result in sentences of imprisonment. *Id.* at 746-47. Despite Appellant Laws's arguments to the contrary, however, the rule in *Nichols* is inapplicable to the instant case. The record reflects that Appellant Laws knowingly and intelligently waived his right to counsel in connection with the 1987 DUI conviction and, thus, it did not constitute an "uncounseled" misdemeanor conviction as addressed in *Nichols*. Furthermore, the fact that Appellant Laws was sentenced to a term of imprisonment in connection with this conviction alone does not preclude the district court from including the offense in the criminal history computation. The knowing and intelligent waiver of the Sixth

enhancement. We find this argument to be without merit for several reasons.

At sentencing, the district court adopted the factual findings as suggested by the probation officer in the PSRs and thereby made Appellants aware of the basis for its application of the two-level enhancement, overruling Appellants' objections on the record to the same. Furthermore, the record at the time of sentencing was replete with examples of the obstructive conduct, including a detailed explanation of the perjury and the transfer of assets outlined in a brief submitted by the government. J.A. at 2405-13. At the time of sentencing, the district court had before it the information in the PSRs, the government's brief, and its own observations of the trial made independent of the jury's verdict of guilty. Based upon this record, the district court found that the enhancement was proper. Moreover, the district court issued the above outlined memorandum and order specifically addressing the findings that gave rise to its application of the enhancement. Although the memorandum and order would have been more properly issued prior to Appellants' filing the notice of appeal, Appellants were adequately aware of the particular basis upon which the trial judge made his decision.

Here, the Court is not faced with a situation in which the trial court altered the sentence or otherwise materially changed the record after the notice of appeal had been filed. Rather, in this case, the district judge merely supplemented the existing record with findings that were consistent with his previous rulings. The district court did not alter the punishment to the benefit or detriment of Appellants, nor did it alter any aspect of the case involved in the appeal. The memorandum and order served only to expand more fully upon the findings that had already been made in open court. Even if we were to find that the filing of the notice of appeal divested the district court of jurisdiction to issue the supplemental statement of reasons, being fully informed of the allegations leading to the court's determination that they obstructed justice, any error on the part of the district court in this regard was harmless and, thus, does not warrant reversal.

DQ ratios were determined from the loan delinquency information contained in the Form 11710A and the Form 11710D reports. The government contends that because these reports contained false loan delinquency information — brought about by LLFC making delinquent loan payments from its own funds — the DQ ratios submitted to Mr. Wilson based upon this information were also false.

At trial, Mr. Wilson testified that if LLFC's DQ ratios were not in proper compliance with GNMA standards, then GNMA was going to end the commitment authority and not issue any more pools. J.A. at 1512C. He further explained that the result of masking the DQ ratios by making delinquent payments from its own funds allowed LLFC to falsely represent to GNMA that its delinquency rates were in compliance. J.A. at 1512C. In this way, LLFC allowed its commitment authority and the issuance of new pools to remain unchanged. We find that this testimony provides an adequate basis upon which the jury could find that the false representations were material and that GNMA relied on the statements in extending additional loan commitments to LLFC. Accordingly, viewing the record in the light most favorable to the prosecution, the evidence presented at trial could have led a rational jury to find Appellants guilty beyond a reasonable doubt as to the false entries convictions.

### 3. Conspiracy Convictions

Appellants further argue that there was insufficient evidence to establish the conspiracy convictions. More specifically, Appellants assert that the government failed to demonstrate that there was a knowing and willing agreement between them to commit a crime because there was insufficient evidence to support the underlying substantive claims. As discussed previously, the government produced sufficient evidence upon which a rational jury could find Appellants guilty beyond a reasonable doubt of making false entries, false claims, and false statements. The evidence produced by the government established that Appellants knowingly and voluntarily entered into an agreement to

commit the underlying substantive offenses, and that they committed an overt act for the purpose of advancing or helping the conspiracy. On this basis, the jury possessed a rational basis upon which it concluded that Appellants were guilty beyond a reasonable doubt of the crime of conspiracy.

## B. Propriety of the Evidentiary Rulings

Appellants also raise several challenges to specific evidentiary rulings made by the district court. As an initial matter, Appellants argue that the district court erred in denying their motions to suppress evidence due to the alleged insufficiency of the search warrant that led to the discovery of such evidence. Furthermore, Appellants contend that the trial court improperly admitted into evidence a 1991 review by HUD's monitoring division, the resulting action by HUD's mortgagee review board, LLFC's July 1991 response to the mortgagee review board, and the settlement agreement and letter of reprimand disposing of the administrative action. In addition, Appellants state that the district court erred in permitting the government to inquire as to their amount of income gained from LLFC and related corporations. We now consider each of these arguments in turn.

## 1. Sufficiency of the Warrant

On July 21, 1996, Special Agent Derek B. Johnson of the Federal Bureau of Investigation prepared an application and affidavit for a search warrant of LLFC's premises. Special Agent Johnson sought the warrant after obtaining information indicating that LLFC regularly falsified loan documents filed with HUD/FHA and fraudulently manipulated its records to give the appearance that it was in compliance with GNMA requirements. Upon review of the affidavit and application, United States District Judge Thomas G. Hull issued a search warrant. The warrant authorized the following items to be seized:

1) Information and/or data stored in the form of magnetic or electronic coding on computer media or in media capable of being read by a computer or with the aid of

The [defendants rely] on *U.S. v. Spears*, 49 F.3d 1136 (6th Cir. 1995), in stating that the adjustment for obstruction of justice is inappropriate when the defendant testifies and the court relies on the jury's verdict of guilt in applying the enhancement. This is true to the extent that the court cannot rely simply on the verdict of guilt to support the enhancement. The court must make findings of specific instances of the defendant's testimony, which was directly contradicted by the testimony of other witnesses. The United States has a transcript of various witnesses at the trial, listing specific examples for the court of direct contradictions to the [defendants'] perjured testimony. This transcript will be provided at the sentencing hearing for the court's use in determining specific examples of perjured testimony. Once this testimony is identified, the enhancement meets the standard set forth in *Spears*.

In the presentence report, the [defendants'] perjured testimony has been used as the basis of the obstruction of justice enhancement. While the probation officer feels that this alone is sufficient to warrant the two-level increase, it should also be noted that the [defendants] . . . transferred over 1.5 million dollars in assets from [LLFC] to John H. Laws, defendant Alan Michael Laws' father, and Elizabeth Logan, wife of co-defendant John Logan. These transactions occurred after the FBI search and seizure of records from [LLFC], and the defendants were aware they were under investigation for the instant offense. Details of these transactions are outlined in the financial section of the presentence report. The transfer of these assets represent[s] an obstruction of justice, in that it impedes the administration in the collection of restitution. The enhancement for the transfer of assets is supported by *U.S. v. Black*, 78 F.3d 1 (1st Cir. 1996).

J.A. at 2319, 2381. Appellants' argument on appeal is tantamount to an assertion of lack of notice with respect to the district court's findings in support of the obstruction of justice

Ms. Lewis pointed to specific entries in her contemporaneous notes in which she detailed Mr. Laws' directions to [falsify documents]. Likewise, Jacquelyn Matheson testified that she was directed by Mr. Laws to complete missing forms for use in FHA claims. Similarly, Leisa Tadlock Campbell testified that she and other employees were personally directed by . . . defendants [Logan and Laws] to falsify documents for use in FHA loan insurance claims. Finally, Sarah Mays, a co-defendant, testified that it was common knowledge throughout [LLFC] that Mr. Gibson was using false documents in FHA claims and that she too had been asked to create false documents.

J.A. at 390-91. Considering the record as a whole, the district court found that, based upon its own assessment of the evidence presented at trial, Appellants committed perjury by giving untruthful testimony on material matters designed to substantially affect the outcome of the case. J.A. at 391. Thus, the district court applied the two-level enhancement to Appellants' Guideline calculation. J.A. at 391. In doing so, the district court was careful to note that it made the finding of obstruction of justice independent of the jury's verdict of guilty. *Id.* Therefore, the district court made its own independent determination that Appellants engaged in obstructive conduct which warranted an application of the enhancement.

Appellants' main argument on appeal is that the district court's memorandum and order making the findings required by § 3C1.1 is without effect because it was issued after Appellants filed a timely notice of appeal and was not timely served on Appellants' counsel. Even assuming that Appellants' position properly reflects the relevant procedural history, we find any error by the district court committed in this regard to be harmless in nature. The information upon which the district court ultimately based its decision to apply the two-level enhancement is clearly set forth in the PSRs, which state:

computer related equipment. This media includes but is not limited to floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and any other media which is capable of storing magnetic coding.

2) Electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include but are not limited to computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives and other computer related electronic devices.

3) Instructions or programs in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized could include but would not be limited to operating systems, application software, utility programs, compilers, interpreters, and any other programs peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

4) Printed material which provide [sic] instructions or examples concerning the operation of a computer system, computer software, and/or any related device.

5) Telephone long distance call records and records of wire and electronic interstate communications.

6) Records, files, documents, notes, correspondence, microfiche, or computerized entries concerning the Department of Housing and Urban Development (HUD), Government National Mortgage Association (GNMA), Federal Housing Administration (FHA), manufactured home dealers, borrowers both past and present, payment history and current loan status of borrowers, loan files and accounts of borrowers, loan applications, and copies

of submissions to FHA, GNMA, HUD, FHA insurance claims and claims records.

7) Accounts receivable and records thereof.

8) Retained copies of documents relating to banking transactions, including but not limited to:
    (1) retained copies of signature cards;
    (2) bank statements;
    (3) canceled checks;
    (4) deposit tickets;
    (5) retained copies of items deposited;
    (6) retained copies of credit and debit memos.

9) Bank correspondence files.

10) Documents in books of original entry containing entries reflecting any and all transactions, including but not limited to General ledgers, General journals, Subsidiary ledgers, including but not limited to loan loss account ledgers, trial balances, Summary journals including but not limited to cash receipts and cash disbursements, Daily posting records and slips, check request forms, "special handling accounts" and "special handling account" reports.

11) Internal documents or instructions to employees, representatives or agents concerning GNMA, FHA, borrowers or manufactured homes dealers, personal and informal files, notes, diaries, telephone call logs and telephone records, calendars and working papers of employees and officers of Logan-Laws, Articles of incorporation, or Partnerships.

12) All of the above listed documents may be found in written or electronic form.

J.A. at 171-176. Thus, the warrant authorized agents of the government to search for and seize any records, files, and documents relating to the mobile home loans made by LLFC co-insured by HUD/FHA and upon which LLFC issued

    A.  I had no knowledge of him doing that.

J.A. at 389 (citing Doc. 360, attachment, pp. 27-28). The district then turned to the following testimony made by Appellant Laws:

    Q.  . . . Did you or not ever [sic] knowingly or willfully make or cause anyone else to make any false claims to HUD?

    A.  No, I didn't.

            * * *

    Q.  Did she [Iva Jean Lewis] ever indicate to you that she was forging any documents?

    A.  No, she didn't not –

    Q.  Did she ever indicate to you she needed to forge any documents to get the claims filed?

    A.  No, she did not.

            * * *

    Q.  Did you ever tell anybody to falsify any documents?

    A.  I never told Jim Gibson or Iva Lewis or anybody else in our office to falsify any documents whatsoever.

J.A. at 389-90. Contrary to this testimony made by Appellants, however, the district court noted that, at trial, witnesses Gibson and Lewis swore under oath that Appellants Logan and Laws directed them to falsify documents for the submission of loan insurance claims. J.A. at 390.

In addition, the district court stated the following with respect to the evidence in the form of testimony made by various LLFC employees:

### 3. Obstruction of Justice Enhancement

We now turn to Appellants' argument that the district court erred when it enhanced their sentences for obstruction of justice. Section 3C1.1 of the Guidelines states that:

If . . . the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense, . . . increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. One type of obstructive conduct specifically mentioned in the Guidelines is perjury. *See id.* at cmt. n.4(b). We employ a clearly erroneous standard in reviewing a district court's factual determination that a defendant's conduct warrants an obstruction of justice enhancement. *See United States v. Walker*, 119 F.3d 403, 405 (6th Cir. 1997).

In the instant case, the court below determined that Appellants falsely testified under oath about a material matter when they denied any knowledge concerning the admission of false and fraudulent claims. J.A. at 389. In particular, in a memorandum and order issued on October 7, 1999, *nunc pro tunc* August 6, 1999, the district court pointed to the following testimony made by Appellant Logan:

Q.   . . . Mr. Logan, at any time, at any time, did you ever direct any employee of [LLFC] to make any false entries in any claims?

A.   No, sir, never.

\* \* \*

Q.   What about Mr. Jim Gibson? What knowledge did you have before your business was closed that he was submitting any false insurance claims to HUD or FHA?

mortgage-backed securities pursuant to GNMA. The government agents executed the search warrant on July 26, 1996.

Prior to trial, Appellants filed motions to suppress the documents and items seized during the search of LLFC. In the motions, Appellants argued that the search warrant was "general" and that it "effectively authorized the seizure of almost every single piece of paper or piece of information in the Logan-Laws corporate building." J.A. at 110. The district court referred the matter to Magistrate Judge Dennis H. Inman for report and recommendation. On February 14, 1997, Magistrate Judge Inman held an evidentiary hearing on, *inter alia*, the motions to suppress. Thereafter, the Magistrate Judge issued a report and recommendation concluding that the "warrant was, in light of the nature of the activity under investigation, and the manner of storing the information, as particular as it could be." J.A. at 112. Furthermore, the Magistrate Judge stated:

This warrant was broad, to be sure, but it was not 'general.' The warrant was rather specific about what could be searched and seized. Although the description encompassed virtually all of the business records of the corporation, that does not mean that the warrant lacked particularity; it simply means that it was extremely broad. The issue, therefore, is 'whether there was probable cause to support a search of this breadth, not whether the warrant was general.'

J.A. at 112 (internal citation and quotations omitted). Finding that all records of the corporation relating to its HUD/FHA and GNMA activities were potentially probative of criminal conduct, Magistrate Judge Inman recommended that the district court deny the motions to suppress on the ground that there was probable cause to support a search of this breadth.

Appellants filed timely objections to the report and recommendation. The district court denied these objections and, consequently, adopted the report and recommendation in its entirety. In a memorandum opinion, the district court

found that the search warrant, though broad, attempted to uncover specific evidence of convoluted fraudulent activity, buried amidst mounds of paperwork and computer documentation. J.A. at 182. In addition, the district court stated the following:

> Because of the complex nature of the criminal scheme in the present case, the warrant could not have been more specific as to the identity of the documents to be seized. Even with the aid of the confidential informants who provided the information upon which the affidavit in support of the warrant was based, the officers could not have known precisely where and in what form documentation of this scheme existed. For example, according to the statements of one informant, the checks used to make payments to delinquent borrowers' accounts were returned to Logan-Laws and stored 'with other records . . . in the second floor storage area,' which also housed all of the 'records dating to the beginning of the Logan-Laws Corporation.' These records also included, amidst mountains of paperwork, evidence, in unknown forms, of fraudulent loan payments and filings with FHA and GNMA. Hence, naming the general class of items, such as all documents relating to the HUD, FHA, and GNMA transactions and loan payments, was as specific as possible, and thus reasonable under the circumstances.

J.A. at 184 (internal citation omitted). Thus, the district court held that the warrant sufficiently stated the items to be seized, even though it effectively encompassed the bulk of the company's records. J.A. at 184.

Appellants contend that the district court should have declared the search warrant invalid because the description of the property did not meet the constitutional standards of particularity. They argue that the warrant was general in nature and, therefore, allowed for a general rummaging search. Furthermore, Appellants contend that the law enforcement officials seeking the warrant had specific

this provision because there are at least two features of his conduct that take this case outside of the heartland of comparable fraud cases. First, Appellant Laws argues that he lacked the intent to steal money from the United States. Second, he argues that the VOE and VOD forms were not even necessary, as the loan files already contained adequate verification of employment and adequate verification of deposit upon which HUD/FHA could and would have relied to pay the majority of the claims. As to the latter argument, Appellant Laws states that while he was found by a jury to have technically violated the law, his intention was not to defraud the government but rather to ensure prompt payment on the claims to which it was rightfully entitled payment.

The refusal of a district judge to make a downward departure is not ordinarily appealable. *See United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). In *United States v. Davis*, 919 F.2d 1181, 1187 (6th Cir. 1990), we held:

> Where, as here, the guideline range was properly computed, the district court was not unaware of its discretion to depart from the guideline range, and the sentence was not imposed in violation of law or as a result of an incorrect application of the guidelines, the failure to depart is not cognizable on appeal under 18 U.S.C. § 3742(a).

In the instant case, Appellant Laws does not make any effort to avoid this rule, which prevents him from making the argument concerning the downward departure in this Court. Furthermore, the district judge went beyond this Circuit's requirements in ruling on the motion, by stating affirmatively that he was aware that he possessed the power to make a downward departure but declined to do so. *Cf. Byrd*, 53 F.3d at 145 (explaining that the trial judge does not have a duty to state affirmatively that he knows that he possesses the power to make a downward departure, but declines to do so). For these reasons, we affirm the district court's ruling.

HUD/FHA incurred due to the false claims convictions; (2) the amount of loss under the relevant conduct figure calculated in light of the conspiracy convictions; and (3) the amount of loss incurred by GNMA, we conclude that the district court properly applied § 2F1.1(b), which required it to increase Appellants' base offense level of six by fourteen levels, resulting in a level twenty. U.S.S.G. § 2F1.1(a) and (b)(1)(O). As such, we find Appellants' argument concerning the district court's computation of loss and corresponding increase in the offense level to be without merit. The district court's computation of loss in this case is, therefore, affirmed.

## 2. Downward Departure

Next, we consider Appellant Laws' argument that the district court improperly refused to depart downward from its sentencing computation under the Guidelines. The record reflects that counsel for Appellant Laws filed a written motion in the district court just one day prior to the sentencing hearing, in which he requested a downward departure from the Guidelines pursuant to § 5K2.0. J.A. at 391-92. While recognizing its authority to make such a departure, the district court, nevertheless, found that the grounds set forth in the motion and supporting memorandum did not warrant the requested departure. J.A. at 392. On this basis, the district court denied the motion. J.A. at 392. Appellant Laws now objects to the district court's failure to grant him a downward departure pursuant to § 5K2.0 of the Guidelines.

Section 5K2.0 states, in pertinent part:

the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

U.S.S.G. § 5K2.0 (internal quotations omitted). Appellant Laws argues that he was entitled to a departure pursuant to

information with which they could have limited the search to a significant degree but which they chose not to include in the warrant. Based upon these alleged deficiencies, Appellants state that the district court erred in denying their motions to suppress.

We review a district court's factual findings regarding motions to suppress for clear error and its legal conclusions *de novo*. *See United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000). In doing so, we extend great deference to a previous finding of probable cause for the issuance of the search warrant. *See id.* Thus, it is this Court's task to determine whether, in light of the totality of the circumstances, the judge issuing the warrant had a substantial basis for concluding that a search of the specified premises would uncover evidence of wrongdoing. *See id.*

The Fourth Amendment to the United States Constitution requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The purpose of this particularity requirement is to prevent the use of general warrants authorizing wide-ranging rummaging searches in violation of the Constitution's proscription against unreasonable searches and seizures. *See Andresen v. Maryland*, 427 U.S. 463, 480 (1976); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994); *see also United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991) (recognizing that the warrant must enable a searcher to reasonably ascertain and identify the things which are authorized to be seized). This Court has recognized that the issue of whether a warrant is general, or lacks the requisite particularity, is best resolved upon examination of the circumstances of the particular case. *See White Fabricating Co. v. United States*, 903 F.2d 404, 411 (6th Cir. 1990); *see also Blair*, 214 F.3d at 697 (stating that "the degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved"); *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988) (finding that the particularity required depends on the items sought and the specific circumstances in the case). A

description contained in a warrant is sufficiently particular if it is as specific as the circumstances and the nature of the alleged crime permit. *Blair*, 214 F.3d at 697. In addition, once a category of documents has been adequately described in the warrant, in part by an illustrative list of items to be seized, the Fourth Amendment is not violated when officers executing the warrant exercise minimal judgment as to whether a particular document falls within the described category. *See id.*

In this case, we find that the lower court correctly determined that the search warrant satisfies the particularity requirement. The search warrant at issue authorizes the seizure of items specifically related to false or fraudulent activity taking place within the context of the HUD/FHA co-insured loans and the GNMA mortgage-backed securities. In particular, items such as records, files, documents, notes, correspondence, microfiche, or computerized entries concerning HUD/FHA, GNMA, manufactured home dealers, borrowers both past and present, payment history and current loan status of borrowers, loan applications, and copies of submissions to FHA, GNMA, and HUD, FHA insurance claims, and other claims records could logically lead to evidence that Appellants were involved in the suspected illegal activity. Appellants' argument concerning the particularity requirement is based upon their position that investigating officers dug too deeply into the overall business of LLFC, instead of focusing on one portion of the operation that was alleged to have involved illegal practices. Appellants miss the point.

From the face of the search warrant and accompanying affidavit, it is clear that the warrant's general nature was due to the investigators' belief that granting HUD/FHA co-insured loans and GNMA mortgage-backed securities constituted LLFC's entire operation. That being the case, law enforcement officials were necessarily involved in an examination of an extensive paper trail in order to discover which transactions may have been illegal in nature. Keeping in mind that the particularity requirement is determined

The general rule in determining loss requires the court to examine the causal connection between the criminal conduct and the alleged loss, and whether it was reasonably foreseeable to the defendants that the loss would occur. *Cf. United States v. Krenning*, 93 F.3d 1257, 1269 (5th Cir. 1996) (stating that the amount of loss must bear a reasonable relation to the actual or intended harm of the offense). In this regard, the district court observed that:

> [LLFC] had a high delinquency rate in its loan portfolio due to the high number of falsifications in the documents, which falsifications were the direct result of defendants' knowing and willful actions. Loans were therefore made to individuals who were poor credit risks. The government has established by a preponderance of the evidence that [LLFC] manipulated the delinquency rate information in order to conceal its true delinquency rate from GNMA authorities. In other words, "but for" the criminal action by these defendants, the additional loans would not have been issued by [LLFC] and underwritten by GNMA. It was foreseeable to these defendants that a high number of loans would default because [LLFC] had been previously warned by GNMA that the default/delinquency rate was not currently at an acceptable level.

J.A. at 387-88 (footnote omitted). Upon a thorough review of the evidence presented at trial, in addition to the law and argument set forth by the parties on this issue, we find that the district court properly concluded that it was reasonably foreseeable that the loss in question would be incurred by GNMA as a direct result of Appellants' conduct. For this reason, we affirm the district court's ruling that the loss incurred by GNMA was in the amount of $5,194,860. Furthermore, the district court correctly added this loss to that incurred by HUD/FHA, finding that the total loss was at least $9,271,400.

Based upon our determination that the district court made proper findings concerning: (1) the amount of loss to

court's finding concerning the relevant conduct for purposes of sentencing.

Section 1B1.3(a)(1)(A) of the Guidelines explains that fraudulent claims that are submitted and paid, but not part of the counts of conviction, shall be included in the sentencing calculation as relevant conduct. This provision instructs that the offense level be determined based upon "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(A). Here, Appellants were found guilty on the charge of conspiracy to defraud the United States. The additional false claims were identified at trial by Mr. Gibson. The record further reflects that, upon examination by HUD investigators, the files in question did contain false claims. As such, these claims constitute additional criminal wrongdoing, not specifically charged in the Indictment, that is properly taken into consideration when formulating the relevant conduct for sentencing. Based upon the information in the record, we find Appellants' argument concerning the relevant conduct to be without merit.

### c. Amount of Loss to GNMA

Finally, the trial court considered the amount of loss to GNMA which, without knowledge of LLFC's actual loan delinquency rates, extended additional loan pool commitment authority to LLFC. The district court explained that Appellants' misrepresentations resulted in an increased amount of loans and securities, of which 522 loans defaulted. J.A. at 387. The record reflects that these defaulted loans resulted in a loss of $5,194,860 to GNMA. J.A. at 387. Adding the loss incurred by GNMA to the loss incurred by HUD/FHA, the district court found that the PSRs correctly determined the amount of loss to be at least $9,271,400. J.A. at 388.

relative to the specific circumstances in each case, we find that the items sought in light of the illegal activity alleged were appropriate. The warrant specified that the items sought were those related to HUD/FHA lending and GNMA securities and, as such, did not violate the particularity requirement of the Fourth Amendment.

Furthermore, even if we were to find that the warrant lacked sufficient particularity under the Fourth Amendment, the district court would still have been correct in denying the motions to suppress under the good faith exception to the exclusionary rule outlined in *United States v. Leon*, 468 U.S. 897, 918-21 (1984). *See Schultz*, 14 F.3d at 1098. The good faith exception to the exclusionary rule states that the fruits of a constitutionally infirm search need not necessarily be suppressed unless: (1) the warrant contained a knowing or reckless falsehood; (2) the issuing judge acted as a mere "rubber stamp" for the police; or (3) the warrant and the affidavit, even after extending appropriate deference to the issuing judge's determination, did not establish probable cause or possessed a technical deficiency such that the executing officers cannot reasonably assume the warrant to be valid. *Leon*, 468 U.S. at 922-23.

In the instant matter, there exists no evidence that Special Agent Johnson gave a knowingly false affidavit or otherwise acted in bad faith upon seeking the search warrant. The warrant was issued by a proper authority, namely United States District Judge Thomas G. Hull. Furthermore, the record is devoid of any evidence that Judge Hull abandoned his neutral role when he issued the warrant. Finally, we cannot say that this warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Schultz*, 14 F.3d at 1098. This being the case, the officers' good faith reliance on the warrant in executing the search was, indeed, reasonable. Therefore, under either scenario, the evidence obtained from the search warrant at issue properly survived Appellants' motions to suppress.

## 2. Admission of the Settlement Agreement

Over Appellants' objections at trial, the district court admitted into evidence: (1) a 1991 review by HUD's monitoring division; (2) the resulting action by HUD's mortgagee review board; (3) LLFC's July 1991 response to the mortgagee review board; and (4) the settlement agreement and letter of reprimand disposing of the administrative action. Appellants contend that the district court erred in admitting this evidence. In particular, Appellants argue that the admission of the settlement agreement was in violation of Federal Rules of Evidence ("Rules") 408, 404(b) and 403. The government asserts that the evidence was relevant, material, and admissible to demonstrate that Appellants were on notice of improprieties in their loan origination process and to explain one reason why Appellants were falsifying loan insurance claims.

We review the district court's admission of testimony or other evidence at trial for an abuse of discretion. *See United States v. Talley*, 164 F.3d 989, 998 (6th Cir. 1999). An abuse of discretion exists only if this Court is firmly convinced that the district court has made a mistake. *See United States v. Wiedyk*, 71 F.3d 602, 608 (6th Cir. 1996). This Court first considers Appellants' argument that the evidence in question was admitted in violation of Rule 408.

Rule 408 provides:

Rule 408. Compromise and Offers to Compromise

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course

The relevant case law also supports the use of intended loss under § 2F1.1, explaining that the figure is designed to assign responsibility for the harm that was meant to take place, regardless of whether the harm did, in fact, occur. *See Moored*, 38 F.3d at 1425. That is, so long as the intended loss is supported by a preponderance of the evidence, the district court may use it in reaching the appropriate offense level. *See id.* at 1427-28. In this instance, the district court found that there was evidence in the record sufficient to support a finding that Appellants caused a loss of $749,876.42 to HUD/FHA. J.A. at 385. Upon a review of § 2F1.1, its accompanying commentary, and the relevant case law as applied to the facts in the record in this case, we find that the court below properly calculated the amount of loss for false claims submitted to HUD/FHA.

### b. Amount of Loss for Conspiracy Convictions

Moreover, because Appellants were found guilty of conspiracy to submit false claims, the district court found that § 1B1.3 of the Guidelines required that all false claims submitted by co-conspirators, even those claims not charged in the Indictment, be included within the relevant conduct for purposes of fashioning the appropriate sentence. At trial, Mr. Gibson testified that there were 335 additional claims submitted to HUD/FHA that contained materially false documents, in addition to those with which Appellants were charged. J.A. at 385, 2233-35. The amount HUD/FHA paid on these additional false claims was $3,326,663.75. J.A. at 385. Based upon this testimony, the district court determined that the total loss for all false claims was $4,076,540.17.

Appellants contest the district court's findings with respect to the loss arising out of the conspiracy convictions. Generally, Appellants argue that the relevant conduct should not have included these additional false claims because the government failed to establish that these 335 loan files actually contained any materially false documents. Accordingly, Appellants ask this Court to reverse the district

inclusion of monies paid by LLFC in annualized amounts for each loan to cover losses, or the value of the note for each loan assigned to the government in exchange for payment of the claim. Such an argument, however, is insufficient to demonstrate that the evaluation of the loss fell outside the realm of permissible computations under the Guidelines. The commentary to § 2F1.1 provides:

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. . . .

*Id.* at cmt. n.9. Furthermore, the commentary addresses the circumstances presented in fraudulent loan application cases and contract procurement cases in note 8(b), which states:

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

*Id.* at cmt n.8. According to these passages, the district court was not required to make the precise determination of loss caused by Appellants, set-off by amounts recovered on the defaulted loans. To the contrary, the application notes specifically delineate that in circumstances where the intended loss is greater than the actual loss incurred, the district court shall use the intended loss in calculating the proper offense level under the Guidelines.

of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408. The issue of whether Rule 408 serves to prohibit admission of administrative or civil settlement negotiations in a criminal context is one of first impression in this Circuit.

In ruling on motions for judgment of acquittal or, in the alternative, for a new trial, the district court held, without citation, that "Rule 408, which excludes evidence of compromise and settlements in a civil context, does not foreclose the use of this type of evidence in a criminal case." J.A. at 363. Several circuits, including the Second and Seventh Circuits, have confronted the question of whether Rule 408 applies to evidence of a settlement agreement sought to be admitted in a criminal matter. In each instance, the court held that Rule 408 is inapplicable to criminal cases.

The Second Circuit reached the conclusion that Rule 408 does not apply to criminal cases by looking to the plain language of the Rule. *See United States v. Baker*, 926 F.2d 179, 180 (2d Cir. 1991) (finding it "fairly evident that the Rule applies only to civil litigation"). In reviewing the plain language, the court held that words such as "validity" and "claim" establish that the drafters of the Rule intended for it to apply solely in a civil context. *See id.* Furthermore, the Second Circuit has held that the primary policy consideration that underlies the purpose of Rule 408, which is to encourage the settlement of civil cases, does not apply to criminal prosecutions. *See Manko v. United States*, 87 F.3d 50, 54 (2d Cir. 1996); *United States v. Gonzalez*, 748 F.2d 74, 78 (2d Cir. 1984); *see also United States v. Peed*, 714 F.2d 7, 10 (4th Cir. 1983) (holding that Rule 408 was inapplicable in the context of a criminal case because the negotiations at issue "were not negotiations aimed at settling a civil claim,

negotiations that the policy behind Rule 408 seeks to encourage").

Similarly, the Seventh Circuit held that the plain language of Rule 408 reflects that it applies only to civil cases, "specifically the language concerning validity and amount of a claim." *United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir. 1994). In addition, the court recognized that nothing in Rule 408 particularly circumscribes the use of evidence of settlement negotiations with a private party in the context of a criminal case. *See id.* Finding that the public interest in the prosecution of crime is greater than the public interest in the settlement of civil disputes, the court made clear that the law in the Seventh Circuit provides that Rule 408 should not be applied to criminal cases. *See id.*

We find that the cases that exist in the Second and Seventh Circuits are correct in concluding that the plain language of Rule 408 makes it inapplicable in the criminal context. Although this conclusion arguably may have a chilling effect on administrative or civil settlement negotiations in cases where parallel civil and criminal proceedings are possible, we find that this risk is heavily outweighed by the public interest in prosecuting criminal matters. Based upon the foregoing, we conclude, as have the Second and Seventh Circuits, that Rule 408 does not serve to prohibit the use of evidence from settlement negotiations in a criminal case.

Next, we turn to Appellants' argument that the 1991 review by HUD's monitoring division, the resulting action by HUD's mortgagee review board, LLFC's July 1991 response to the mortgagee review board, and the settlement agreement and letter of reprimand disposing of the administrative action were inadmissible pursuant to Rule 404(b). That Rule provides, in pertinent part:

Rule 404. Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the

---

incurred due to the false claims convictions. Next, the district court inquired as to the amount of loss calculated in light of the conspiracy conviction. Last, the district court included the amount of loss incurred by GNMA. The district court added these three figures to arrive at a total loss of at least $9,271,400 for purposes of sentencing. Section 2F1.1(b) provides that if the loss was more than $5,000,000 but less than $10,000,000, then the district court shall increase the base offense level of six by fourteen levels, resulting in an offense level of twenty. U.S.S.G. § 2F1.1(a) and (b)(1)(O). Accordingly, the district court increased Appellants' offense levels to twenty. We now consider Appellants' argument that the district court's computation of loss and corresponding increase in the offense levels was in error.

**a. Amount of Loss for False Claims Convictions**

In examining the amount of actual or intended loss caused by Appellants' false claims, the district court first noted the presentence investigation reports' ("PSRs'") calculation of $750,000 in actual or intended losses to HUD/FHA. J.A. at 384-85. The court adopted the PSRs' calculation in this regard, based in part on the undisputed fact that HUD/FHA paid a total of $709,876.42 in actual loss on 69 of the 74 false claims. J.A. at 385. With respect to three of the false claims upon which HUD/FHA denied payment, the district court found that because the average claim payment was approximately $10,000, those claims represented an additional $40,000 in intended losses to HUD/FHA. J.A. at 385 (citing *United States v. Moored*, 38 F.3d 1419, 1427 (6th Cir. 1994) ("'[L]oss' under § 2F1.1 is not the potential loss, but is the actual loss to the victim, or the intended loss to the victim, whichever is greater.")) Adding the $709,876.42 in actual loss to $40,000 in intended loss, the district court arrived at $749,876.42 as the total amount of loss to HUD/FHA. J.A. at 385.

Appellants contest the computation of the false claims figure by arguing, *inter alia*, that it fails to include any set-offs for amounts collected on the defaulted loans, the

challenge involves the district court's ruling concerning an investigation into alleged jury misconduct at trial. Prior to addressing these particular issues, we briefly reiterate the district court's general determinations at sentencing.

At the sentencing hearing, the district court allowed testimony and other evidence concerning Appellants' objections to the presentence investigation reports. Upon conclusion of such evidence and argument related to the same, the district court sentenced each Appellant to a term of eighty-seven months of imprisonment, to be followed by a three-year term of supervised release. The court further ordered that Appellants make restitution to the victims in this case, namely HUD/FHA and GNMA, in the amount of one million dollars. Appellants now appeal their sentences to this Court.

## 1. Amount of Loss

Appellants first contend that the district court erred in calculating the amount of loss attributable to them at sentencing. The district court's definition of loss is a question of law to be reviewed *de novo*. *See United States v. Kohlbach*, 38 F.3d 832, 841 (6th Cir. 1994). We review the district court's factual findings with respect to loss under the clearly erroneous standard. *See id.* To the extent that one challenges the district court's calculation of loss, therefore, the appellant bears the heavy burden of persuading the reviewing court that "the evaluation of the loss was not only inaccurate, but was outside the realm of permissible computations." *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994).

In this case, the district court computed the amount of loss under § 2F1.1 of the Sentencing Guidelines. Section 2F1.1 of the Guidelines governs the calculation of loss for offenses involving fraud or deceit. That section begins by assigning a base offense level of six, and then increasing the base offense level by the amount of loss. In the instant case, the district court computed the amount of loss using three figures. First, the district court determined the amount of loss to HUD/FHA

character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b). On appeal, Appellee contends that these documents were properly admitted to prove knowledge and intent to defraud.

In *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 488 (6th Cir. 1999), this Court set out a three-part test for the admission of evidence under Rule 404(b). In that case, we stated:

This court requires a district court to make three findings before the district court admits evidence under Federal Rule of Evidence 404(b). The district court must find that the prior bad acts occurred (a finding reviewed for clear error); that the evidence helps prove a material issue (a finding reviewed de novo); and that the evidence passes the balancing test of Rule 403 (a finding reviewed for abuse of discretion).

*Id.* (citing *United States v. Jobson*, 102 F.3d 214, 220 (6th Cir. 1996)). Appellants do not contest the first or second elements, implicitly admitting that the bad acts transpired and that the evidence helps to prove a material issue. Instead, Appellants direct their argument to the third element, claiming that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under Rule 403.

Rule 403 states the following:

Rule 403. Exclusion of Relevant Evidence on Grounds
of Prejudice, Confusion, or Waste of Time

Although relevant, evidence may be excluded if its
probative value is substantially outweighed by the danger
of unfair prejudice, confusion of the issues, or misleading
the jury, or by considerations of undue delay, waste of
time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. In reviewing Rule 403 challenges to the
district court's decision to admit certain evidence, we view
the evidence in the light most favorable to the prosecution.
*See United States v. Sanders*, 95 F.3d 449 (6th Cir. 1996). As
such, we maximize the probative value of the evidence and
minimize its potential prejudice to the defendant. *See id.* The
prejudice noted by the court is only the unfair prejudice
against the defendant caused by the admission of the
evidence. *See id.* Accordingly, "[e]vidence that is prejudicial
only in the sense that it paints the defendant in a bad light is
not unfairly prejudicial pursuant to Rule 403." *Id.* at 453
(citing *United States v. Mullins*, 22 F.3d 1365, 1373 (6th Cir.
1994)). Based upon these standards, the trial court has broad
discretion in deciding whether to admit evidence pursuant to
Rule 404(b). *See Talley*, 164 F.3d at 999.

In this case, the Court finds that the district court did not
abuse its discretion in admitting a 1991 review by HUD's
monitoring division, the resulting action by HUD's mortgagee
review board, LLFC's July 1991 response to the mortgagee
review board, and the settlement agreement and letter of
reprimand disposing of the administrative action. Viewing
the evidence in the light most favorable to the prosecution, the
evidence at issue was properly admitted to demonstrate
Appellants' knowledge, motive, and intent. Although some
prejudice may have arisen due to the admission of this
evidence, the prejudice does not amount to the type of unfair
prejudice contemplated by Rule 403. Based upon the
foregoing, we find that the trial court acted within its broad
discretion in admitting the evidence pursuant to Rule 404(b)
and that Appellants' argument in this regard is without merit.

### 3. Admission of Income Evidence

Similarly, Appellants contend that the district court erred in
permitting Appellee to inquire about the amount of their
income from LLFC and related corporations. The evidence
in question reflected a gross income of over $700,000 for
each Appellant. Appellants argue that the admission of this
income evidence was unfairly prejudicial, lacked any
probative value of any element of the crime charged by the
government, and was in violation of Rule 403.

In maximizing the probative value of this evidence and
minimizing its prejudicial effect, we find that the income
evidence was relevant to demonstrate that financial gain was
the motive for the crimes charged. *See, e.g., Pointer v. United
States*, 151 U.S. 396, 414 (1894) (proof of motive always
welcome). Stated another way, Appellants' substantial
income was necessarily dependent upon GNMA's
continuation of LLFC's loan commitment authority. In the
event that GNMA became aware of the actual number of
LLFC's loan delinquencies, the result would have had a
profound financial effect on Appellants, LLFC's sole
shareholders, in that they would cease to gain profits from the
issuance of the mortgage-backed securities. In this way, the
income evidence had a significant probative value because it
demonstrated what Appellants stood to lose if they properly
reported the actual loan delinquencies. For this reason, the
trial court properly exercised its broad discretion in admitting
this evidence.

### C. Post-Trial Rulings

Next, Appellants challenge various post-trial rulings made
in the court below. The first four of these challenges relate to
the district court's decisions in fashioning appropriate
sentences under the Guidelines. More specifically,
Appellants challenge the district court's determination of the
amount of loss attributable to them, its denial of a motion for
downward departure made by Appellant Laws, its application
of an obstruction of justice enhancement, and its computation
of Appellant Laws's criminal history category. The final