F I L E D
United States Court of Appeals
Tenth Circuit

APR 25 2003

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEVEN E. BAILEY,

Defendant - Appellant.

No. 02-3187

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 01-CR-10027-01-MLB)

Daniel E. Monnat, Monnat & Spurrier, Chtd., Wichita, Kansas, for Defendant - Appellant.

Alan G. Metzger, Assistant United States Attorney (Eric F. Melgren, United States Attorney and Nancy Landis Caplinger, Assistant United States Attorney, on the brief), Topeka, Kansas, for Plaintiff - Appellee.

Before **LUCERO** , Circuit Judge, **McWILLIAMS** and **ANDERSON** , Senior Circuit Judges.

**ANDERSON** , Circuit Judge.

Steven Bailey appeals his conviction following a jury verdict on seventeen counts of wire fraud and five counts of money laundering in violation of 18 U.S.C. §§ 1343 and 1957(a). We affirm.

## BACKGROUND

While working at the Boeing Aircraft Company in Wichita, Kansas, for eleven years, Bailey developed an interest in financial markets. In 1993, he left Boeing to pursue investing in the stock market, utilizing investment strategies which he developed himself. He never received any formal training in stock market investments. In May 1996, he formed the Bailey Investment Management Partnership, a general partnership, consisting of Investing Partners and Bailey as the Managing Partner. All the partners were family members and/or close friends of Bailey's. At its inception, the Partnership consisted of Bailey and eleven partners.

The Partnership Agreement was year-to-year, so investing partners entered or reentered the Partnership each year. The Partnership Agreement provided as follows with respect to Bailey's authority as Managing Partner:

> The Managing Partner shall be authorized to and delegated the responsibility of investing the Partnership's funds in common stocks of companies which exhibit high earnings growth and high stock appreciation potential, with a goal of the Partnership to maximize capital growth. The Managing Partner shall have no authority to invest in and shall be specifically prohibited from investing

-2-

Partnership funds in real estate, oil and gas properties, commodities, futures, options, or any other high risk investment not specifically authorized in this paragraph.

App. Vol. I at 244. Investing partners sent Bailey capital to be invested around the beginning of each year. Bailey opened a Partnership checking account at Commerce Bank in Wichita and opened on-line accounts with DATEK Online and Discover Direct Brokerage, all in the name of the "Steve Bailey Partnership."

After the first year, more friends and acquaintances of Bailey's joined Bailey Investment Management Partnership. Bruce Wilgers, the chief financial officer at Fidelity Bank in Wichita, Jim Ruane, Fidelity's senior vice president and general counsel, and John Laisle, Fidelity's executive vice president, all eventually joined the Partnership.

Between May 1998 and May 1999, Bailey made seventeen wire fund transfers from the Partnership's DATEK account to his personal account at Boeing Wichita Employees Credit Union. Bailey used those transferred funds to obtain "contracts for futures" in his personal account at various institutions which traded in futures. None of these transactions were authorized by the Partnership Agreement or the other partners. As indicated, the Partnership Agreement specifically prohibited Bailey from investing in futures or "any other high risk investment." Bailey also apparently used funds transferred from the Partnership accounts to his personal accounts to pay for a new home he built for his family.

Bailey was required by the Partnership Agreement to provide quarterly reports to the partners. Those reports falsely reported the Partnership capital, Partnership earnings and Bailey's Partnership income. They also failed to reveal that Bailey was investing in futures, in contravention of the Partnership Agreement.

After initially experiencing success in the stock index market, taking the initial Partnership investment of $200,000 and increasing that amount to $1.4 million, Bailey ended up losing virtually all of the Partnership investment money. In a report to the partners dated June 30, 1999, Bailey listed the ending capital of the Partnership as $2,418,292.26. App. Vol. II at 477; App. Vol. III at 618. In reality, at that point, the Partnership capital was something less than $2000. App. Vol. II at 478; App. Vol. III at 618-19.

On June 30, 1999, Bailey's parents loaned him $600,000, which Bailey placed in the Partnership accounts. Bailey gave his parents a mortgage on his new home to secure the loan. Apparently, Bailey lost most of that $600,000 as well.

From the beginning of the Partnership until its termination in August 1999, the Investing Partners invested more than $1,941,000.00 in the Partnership. At the time of its termination, the Partnership consisted of Bailey and more than 50 investors. The Partnership account contained $369,676.00 upon its termination.

None of the partners made money from their investments; rather, virtually all of them lost their investments. [1]

In August 1999, Laisle filed suit against Bailey, alleging that Bailey had committed various acts in violation of the Partnership Agreement. The suit sought termination of the Partnership and to have an accounting. Another investor, James Ruane, filed another civil action against Bailey, his wife and his parents, alleging that they had participated in a fraudulent conveyance, that the mortgage on the Bailey home should be set aside, and that the home should be held in trust for the partners. Eventually, the two suits were certified as class actions and were consolidated.

The civil suits resulted in a settlement. The government thereafter charged Bailey with seventeen counts of wire fraud and five counts of money laundering. On March 7, 2001, Bailey was indicted in a twenty-two count indictment. Counts one through seventeen alleged seventeen separate wire transfers from the DATEK Partnership account to Bailey's personal account at the Boeing Wichita Employee's Credit Union, in violation of the wire fraud statute, 18 U.S.C. § 1343. Counts eighteen through twenty-two alleged five incidents where he transferred funds from his personal account at Boeing Employee's Credit Union to other

---

[1]A few partners had apparently "cashed out" of the Partnership, and Bailey had returned their money in full. The total sum "cashed out" was less than $100,000.

accounts under his control, in violation of the money laundering statute, 18 U.S.C. § 1957(a).

Bailey initially retained Stephen M. Joseph as defense counsel. On May 7, 2001, the government filed a motion to disqualify Joseph because of his pre-indictment relationship with Ruane, one of the investors in the Partnership and a plaintiff in the civil suits against Bailey. The district court by written order granted the government's motion.

Bailey then retained Jack Focht as defense counsel, who entered his appearance on July 31, 2001. As explained more fully below, Bailey filed a substitution of counsel on November 12, 2001, substituting Steve Rosel for Jack Focht.

Trial to a jury commenced on November 27. At the close of the government's evidence, and at the close of all evidence, Bailey moved for a judgment of acquittal which was denied. On December 3, 2001, the jury found Bailey guilty of all seventeen counts of wire fraud in violation of 18 U.S.C. § 1343 and all five counts of money laundering in violation of 18 U.S.C. § 1957(a).

The Presentence Investigation Report ("PSIR") indicated a guideline range of 63 to 78 months. Bailey filed a number of objections to the PSIR, to which the government responded. Applying the 2001 sentencing guidelines, the court

grouped the money laundering and wire fraud counts pursuant to USSG §3D1.2. Because Bailey's money laundering counts resulted in the highest offense level, the court calculated Bailey's base offense level under §2S1.1, which applies to money laundering. Acknowledging that, pursuant to USSG §2B1.1, the amount of loss is to be reduced by any amount returned "to the victim" of the crime before the offense was detected, the court considered whether the $600,000 returned to Bailey and placed in the Partnership accounts was returned "to the victim." The court concluded that there was no evidence that all of the $600,000 was actually given to the victims before Bailey's crimes were detected. The court further imposed a two-level increase for abuse of a position of trust, and declined to reduce Bailey's base offense level for acceptance of responsibility. The court imposed a 57-month sentence on each of the 22 counts, to run concurrently, and imposed restitution in the amount of $949,044.52.

Bailey appeals. He also filed with the district court a motion for release pending appeal. The district court denied the motion, and we affirmed that denial. Bailey has renewed his appeal of the district court's denial of release pending appeal, and we have again affirmed that denial.

Bailey argues: (1) he was denied his right to counsel of choice when the district court disqualified his attorney, Steven Joseph, over Bailey's objection; (2) the government's evidence was insufficient to overcome Bailey's good-faith

defense and sustain his conviction beyond a reasonable doubt; (3) the indictment failed to allege a crime and the evidence was insufficient as a matter of law to prove that Bailey used a wire communication to further a fraudulent scheme; (4) at trial, the government relied on a scheme not charged in the indictment and there was therefore an unconstitutional variance between the indictment and the proof at trial; (5) the court's good-faith instruction was internally inconsistent and confusing; (6) the government erred in presenting rebuttal testimony concerning the terms of the civil settlement and the court committed plain error in admitting that evidence; and (7) the court erred in its interpretation and application of the sentencing guidelines in (a) calculating the amount of loss; (b) enhancing Bailey's sentence for abuse of a position of trust; and (c) refusing to reduce his base offense level for acceptance of responsibility.

## DISCUSSION

### I. Disqualification of Counsel

Under certain circumstances, we review the district court's decision to disqualify counsel for an abuse of discretion only. However, where a defendant's Sixth Amendment right to counsel is implicated, and where the district court's decision is premised not on in-court conduct but on the interpretation of ethical norms as applied to undisputed facts, our review is de novo.

United States v. Anderson, 319 F.3d 1218, 1221 (10th Cir. 2003) (citation omitted). The government moved to disqualify Steven Joseph, Bailey's first trial

counsel, on the ground that one of Bailey's investing partners, and a plaintiff in the civil suit against Bailey, James Ruane, had met with Joseph to discuss Joseph's possible representation of Ruane and the class of plaintiffs in that civil suit.[2] Also at the time of that meeting, Ruane was "of counsel" to the law firm of Redmond & Nazar, L.L.P., where William Wooley, a personal friend of Ruane's, was an associate. Ruane had retained Wooley to represent him and the other plaintiffs in the civil action against Bailey. In December 1999, Wooley, Ruane and Joseph met for approximately three hours to discuss the possibility of Joseph representing Ruane and the plaintiffs in the civil action. Ruane and Joseph met again, at a later date, where Joseph proposed a fee structure to Ruane that Ruane determined was not acceptable. Accordingly, Ruane did not in fact retain Joseph as counsel in the civil case.

When this criminal action was brought against Bailey, he retained Joseph to represent him. The government subsequently filed a motion to disqualify Joseph, arguing that, even though Ruane did not pay Joseph a fee, the evidence, primarily in the form of affidavits from Ruane, demonstrates that an attorney-client relationship existed between Ruane and Joseph for the purposes of Rule 1.9(a) of

---

[2]At the time Ruane and Joseph met, Ruane was the "proposed Class representative in the recently certified class action against" Bailey. Second Ruane Aff. at ¶ 4, App. Vol. VI at 914.

the Model Rules of Professional Conduct, which has been codified in the Kansas

Rules of Professional Conduct. Rule 1.9(a) provides:

> Conflict of Interest: Former Client
>
> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known.

Model Rules of Prof'l Conduct R. 1.9; Kan. Rules of Prof'l Conduct R. 1.9.

The only issue the parties dispute in this case is the "threshold question" of "whether there was an attorney-client relationship [between Ruane and Joseph] that would subject a lawyer to the ethical obligation of preserving confidential communications." Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1384 (10th Cir. 1994). We have further stated that:

> For there to have been an attorney-client relationship, the parties need not have executed a formal contract. Nor is the existence of a relationship dependent upon the payment of fees. However, a party must show that (1) it submitted confidential information to a lawyer and (2) it did so with the reasonable belief that the lawyer was acting as the party's attorney.

Id. (citation omitted).

-10-

Ruane and Joseph submitted affidavits under seal, which the district court carefully evaluated to assess whether Ruane provided any confidential information to Joseph. [3] The court held that he had, and therefore an attorney-client relationship existed between Ruane and Joseph for purposes of Rule 1.9. After conducting our own *de novo* review of the entire record in this case, we agree with that conclusion, for substantially the reasons set forth in the district court's memorandum and order granting the government's motion to have Joseph disqualified from representing Bailey. [4]

---

[3]Bailey has filed a motion, referred to this panel, to unseal those documents and pleadings filed under seal. The motion is not opposed, in writing or at oral argument of this appeal, and the materials in the sealed portion of the record were discussed in the briefs and at oral argument. Further, we fully considered the entire record, including those parts under seal. The motion is granted.

[4]At oral argument of this appeal, there was a suggestion that Bailey's argument about disqualification of Joseph was more properly framed as a claimed violation of his due process rights by the district court's denial of a continuance when Bailey decided to obtain a third attorney a few weeks before his trial commenced. Assuming, arguendo, that this issue is even properly before us, we conclude that Bailey's due process rights were not violated in this case.

After Joseph was disqualified, Bailey retained Jack Focht as his attorney. No one suggests that Focht's representation, which lasted more than three months, was anything other than exemplary. On November 7, 2001, some twenty days before trial was to commence, the district court was contacted by Steven Rosel, who stated that Bailey had contacted him about possibly representing Bailey but that he (Rosel) could not be ready to go to trial in twenty days. The court informed Rosel that it would grant no continuance. Nonetheless, on November 12, Rosel entered his appearance as Bailey's counsel, replacing Focht. Rosel made no formal motion for a continuance. Bailey suggests that the court's initial disqualification of Joseph, in conjunction with its denial of a continuance, set in motion a chain of events which led to his representation at trial by Rosel,

(continued...)

-11-

## II. Sufficiency of Evidence

At both the close of the government's case and at the close of all the evidence, Bailey moved for a judgment of acquittal, which was denied. He argues that the district court erred in denying his motion, contending that the government's evidence "failed to prove beyond a reasonable doubt that Mr. Bailey—who was shown to have made every effort to increase the value of the partnership—had the requisite intent to defraud his partners." Appellant's Br. at 30.

We review the "denial of a motion for judgment of acquittal *de novo*, viewing the evidence in the light most favorable to the government." United States v. Austin, 231 F.3d 1278, 1283 (10th Cir. 2000). We must determine whether there is evidence "from which a jury could find the defendant guilty beyond a reasonable doubt." Id. In reviewing that evidence, however, we do not "weigh the evidence or consider the credibility of the witnesses in making [our] determination." Id. We may reverse the jury's verdict "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[4](...continued)
whom he (Bailey) alleges was unprepared and provided poor representation in various ways. However, Bailey overlooks the fact that his own decision to terminate Focht's services, for reasons which he does not even attempt to explain, caused him to be represented at trial by Rosel.

doubt." United States v. Haslip, 160 F.3d 649, 652 (10th Cir. 1998) (quotation omitted).

To establish wire fraud, the government had to prove "(1) a scheme or artifice to defraud and (2) use of interstate wire communications to facilitate that scheme." United States v. Janusz, 135 F.3d 1319, 1323 (10th Cir. 1998). Similarly, money laundering requires a specific intent to launder the proceeds from a known illegal activity. See United States v. Rahseparian, 231 F.3d 1257, 1261 (10th Cir. 2000). Because it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom. Thus, "[i]ntent may be inferred from evidence that the defendant attempted to conceal activity. Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use." United States v. Prows, 118 F.3d 686, 692 (10th Cir. 1997) (quotation omitted). Further, "[e]vidence of the schemer's indifference to the truth of statements can amount to evidence of fraudulent intent." United States v. Trammell, 133 F.3d 1343, 1352 (10th Cir. 1998) (quotation omitted).

The record contains evidence that Bailey transferred funds by wire from the Partnership account and placed them in his personal account; that he used the funds in his personal account to invest in high risk investments, in direct

contravention of the terms of the Partnership Agreement; that he hid these actions from his partners; and that he misrepresented to his partners the status of the Partnership account, including the profits allegedly made and the amount of commissions he withdrew. There was accordingly sufficient evidence from which the jury could infer that he acted with the requisite culpable mental state.

### III. Sufficiency of Indictment and Evidence of Wire Fraud

Next, Bailey alleges that "the indictment failed to allege a crime and the evidence was insufficient as a matter of law to prove that Mr. Bailey used wire communications to further a fraudulent scheme." Appellant's Br. at 34. Bailey's argument appears to be that the indictment failed to allege that the wire transfers by which Bailey transferred funds from the Partnership accounts to his personal accounts had a "communicative aspect" and therefore it failed to allege wire fraud under the statute.

Bailey failed to challenge the adequacy of the indictment until after the jury rendered its guilty verdict.

> Where a defendant first challenges the absence of an element of the offense after a jury verdict, the indictment will be deemed sufficient if it contains words of similar import to the element in question. As long as the indictment contained words sufficient to inform the defendant of the charge against him, the indictment will be upheld. We will find the indictment sufficient unless it is so defective that by *any reasonable construction*, it fails to charge the offense for which the defendant is convicted. Because of this liberal construction rule,

-14-

an indictment challenged for the first time post-verdict may be found sufficient, even though that indictment would have been found wanting had it been challenged pre-verdict.

United States v. Avery, 295 F.3d 1158, 1174 (10th Cir. 2002) (citations and quotations omitted); see also United States v. Hathaway, 318 F.3d 1001, 1009-10 (10th Cir. 2003).

The wire fraud statute makes it illegal to "transmit[] or cause[] to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing [a] scheme or artifice [to defraud]." 18 U.S.C. § 1343. The indictment alleged that Bailey:

> did knowingly and willfully devise a scheme or artifice to defraud, for the purpose of executing the scheme to defraud and for obtaining money or property by means of false or fraudulent pretenses, representations or promises, did transmit by means of wire communication in interstate commerce, writings, signs, signals or sounds which transferred the following partnership money from Datek . . . to the defendant's personal account . . . .

App. Vol. I at 16-17. The indictment then listed each of the seventeen transfers with the date the transfer was made and the amount transferred. The government introduced evidence at trial of those transfers. The indictment adequately alleged the crime of wire fraud. It "set[] forth the elements of the offense charged, [and] put[] the defendant on fair notice of the charges against which he [had to defend]." Hathaway, 318 F.3d at 1009. Further, the wire transfers were

-15-

"communicative" in that they conveyed information about the accounts from which and into which funds were to be transferred and the amounts to be transferred, and they in fact transferred those funds. Finally, we have previously found a conviction for wire fraud supported by wire transfers of money. See Janusz, 135 F.3d at 1324.

## IV. Variance

Bailey argues there was a fatal variance between the indictment and the proof at trial, in that the indictment alleged a scheme involving the fraudulent promise not to invest Partnership money in high risk investments, and the unauthorized transfer of Partnership funds to his own personal accounts to accomplish those investments, but the government introduced at trial evidence of false quarterly reports to the partners. Bailey argues he was prejudiced by this variance because he had no notice that the government would "pursue a theory of fraud based on Mr. Bailey's inaccurate quarterly reports" and because it "created the possibility either that the jury may have convicted Mr. Bailey of an uncharged scheme, or that the jury's verdict was not unanimous as to which alleged scheme—the futures fraud or the uncharged quarterly-reports fraud—supported the convictions." Appellant's Br. at 41.

-16-

Bailey failed to argue below that there was a variance between the indictment and the proof at trial, so we review the issue under the plain error standard. See United States v. Dennis, 237 F.3d 1295, 1300 (11th Cir. 2001); United States v. Young, 862 F.2d 815, 820 (10th Cir. 1988). "To notice plain error under Fed. R. Crim. P. 52(b), the error must (1) be an actual error that was forfeited; (2) be plain or obvious; and (3) affect substantial rights, in other words, in most cases the error must be prejudicial, i.e., it must have affected the outcome of the trial," United States v. Haney, 318 F.3d 1161, 1166 (10th Cir. 2003) (en banc), in that it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993).

"A variance arises when the evidence adduced at trial establishes facts different from those alleged in the indictment, and denigrates the Sixth Amendment right 'to be informed of the nature and cause of the accusation.'" United States v. Caballero, 277 F.3d 1235, 1243 (10th Cir. 2002) (quoting U.S. Const. amend. VI) (citation omitted). "Any such variance is reversible error only if it affects the substantial rights of the accused." United States v. Hanzlicek, 187 F.3d 1228, 1232 (10th Cir. 1999). "A defendant is substantially prejudiced in his defense either because he cannot anticipate from the indictment what evidence will be presented against him, or because the defendant is exposed to the risk of double jeopardy." Caballero, 277 F.3d at 1243.

Consistent with the wire fraud statute, the indictment alleged that Bailey "did knowingly and willfully devise a scheme or artifice to defraud, for the purpose of executing the scheme to defraud and for obtaining money or property by means of false or fraudulent pretenses, representations or promises." App. Vol. I at 16. It then alleged that Bailey "transmitt[ed] by means of wire communication in interstate commerce, writings, signs, signals or sounds which transferred . . . partnership money . . . ." Id. The jury was instructed that to sustain its burden of proof on the wire fraud charge, the government had to prove that (1) "Defendant knowingly devised and specifically intended to devise a scheme or artifice to defraud for obtaining, or attempting to obtain, money by means of false or fraudulent pretenses, representations or promises;" and (2) that "Defendant used interstate wire communications for the purpose of carrying out the scheme." Id. at 157.[5] See Janusz, 135 F.3d at 1323 (noting that "[t]o establish wire fraud under 18 U.S.C. § 1343, the government must prove (1) a scheme or artifice to defraud and (2) use of interstate wire communications to facilitate that scheme").

We perceive no prejudicial variance between the indictment and the evidence at trial. The government established that Bailey's scheme to defraud

_____

[5]The district court also instructed the jury that the government had to establish that Bailey's actions "occurred, in whole or in part, in Kansas." App. Vol. I at 157.

-18-

consisted of defrauding his partners by using their investment funds without their knowledge to make personal trades in types of investments specifically prohibited by the partners. As a part of that scheme, indeed to facilitate its success, Bailey misrepresented to his partners the status of their accounts with the Partnership. The government did not allege two separate schemes, one involving false quarterly reports and one involving the wire transfers, but one single scheme to defraud accomplished by various means. "Elements [of an offense] . . . must be found unanimously by the jury." United States v. Powell, 226 F.3d 1181, 1196 (10th Cir. 2000). "On the other hand, the jury need not agree unanimously on the *means* by which an element is proven." Id. We therefore find no prejudicial variance, no risk that the jury did not reach a unanimous verdict, and therefore no error, let alone a plain error, in this case.

## V. Good Faith Instruction

Bailey next argues that the court's good-faith instruction "was internally inconsistent and confusing." Appellant's Br. at 46. Bailey initially requested a modification to the court's proposed good faith instruction, presenting to the court an alternative instruction he thought was less confusing. The court considered Bailey's proposed instruction, apparently made a slight modification to the good-faith instruction it had originally proposed, and then proposed to the parties the

good-faith instruction to which Bailey now objects. At the subsequent jury instruction conference, the court submitted the modified good-faith instruction, to which Bailey made no objection.

Because Bailey failed to object to the instruction given at the time, we review his assertion of error now under the plain error standard. See United States v. Fabiano, 169 F.3d 1299, 1302 (10th Cir. 1999). Under this standard we may correct an error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 732 (quotation omitted). "[W]e examine [instructions] as a whole to determine whether the jury may have been misled, upholding the judgment in the absence of substantial doubt that the jury was fairly guided." United States v. Wiktor, 146 F.3d 815, 817 (10th Cir.1998) (quotation omitted).

We find no plain error in the good-faith instruction. Bailey does not argue that the instruction was legally incorrect; he just asserts it was internally inconsistent and confusing, thereby preventing the jury from giving effect to his good-faith defense. We disagree. The "honest belief" portion of the instruction to which Bailey now objects correctly informed the jury that, having committed fraud, an honest belief by Bailey that everything would work out does not establish a good faith defense. See United States v. Pappert, 112 F.3d 1073, 1076 (10th Cir. 1997) (approving instruction that "it is no defense to a charge of mail

fraud or wire fraud that the defendant honestly believes in the ultimate success of his business"). We are confident that the jury was not misled, and we have no doubt that it was fairly guided in evaluating Bailey's good faith defense.

### VI. Testimony About Civil Settlement

As indicated, Bailey was sued by a number of his partners in a civil suit, which resulted in a settlement. The written settlement agreement contained the following:

> **1.2.** **Summary of Settlement** . Bailey acknowledges that the settlement due hereunder represents a partial return to the Partnership of funds which Bailey withdrew from Partnership accounts and placed in accounts controlled by him personally, which withdrawals were not authorized under the Partnership Agreement, by the other Partners or by the Partnership itself. Further, Bailey acknowledges that such withdrawals were made between April 1, 1996 and September 30, 1999, in the total net amount of One Million Three Hundred Forty-One Thousand Dollars ($1,341,000.00) after credit for a Six Hundred Thousand Dollar ($600,000.00) deposit.

App. Vol. I at 79. At trial, after Bailey rested, the government presented one rebuttal witness, Bruce Wilgers, a partner and plaintiff in the civil suit, and asked him the following three questions about the settlement agreement:

> Q    Did the Defendant agree and admit that he had withdrawn from partnership accounts and placed in accounts controlled by him personally withdrawals which were not authorized under the partnership agreement?
> . . . .
> Q    Did the Defendant admit that the partners had never given – individual partners had never given him permission to

> withdraw funds from his – from the partnership accounts and deposit them into his personal account?
>
> . . . .
>
> Q    And did the Defendant admit that he had, without authority and authorization, withdrawn over $1,313,000?

App. Vol. III at 753-54. Wilgers answered all three questions affirmatively.

Bailey made no objection to the testimony, so we again review only for plain error. Bailey argues the admission of this testimony violates Fed. R. Evid. 408, that the government's presentation of it was misconduct and that the court's failure to exclude it was plain error.

Rule 408 provides in pertinent part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

Fed. R. Evid. 408. Pursuant to Fed. R. Evid. 1101(b), the Federal Rules of Evidence "apply generally . . . to criminal cases and proceedings."

Our circuit has not yet addressed the question of whether Rule 408 applies to both criminal and civil proceedings, or whether it only applies to civil proceedings in which a party seeks to admit evidence regarding a settlement. The Second, Sixth, and Seventh Circuits have held that it applies only to civil proceedings. Thus, in those circuits the Rule does not bar the introduction in a criminal proceeding of evidence of a settlement.      See United States v. Logan  , 250

F.3d 350, 367 (6th Cir. 2001) ("[W]e conclude, as have the Second and Seventh Circuits, that Rule 408 does not serve to prohibit the use of evidence from settlement negotiations in a criminal case."); Manko v. United States, 87 F.3d 50, 54-55 (2d Cir. 1996) ("[W]e reaffirm our conclusion in [United States v.] Gonzalez [,748 F.2d 74 (2d Cir. 1984)] that the underlying policy considerations of Rule 408 are inapplicable in criminal cases."); United States v. Prewitt, 34 F.3d 436, 439 (7th Cir. 1994) ("Rule 408 should not be applied to criminal cases.").

The Fifth Circuit has held it applies in both civil and criminal proceedings. See United States v. Hays, 872 F.2d 582, 588-89 (5th Cir. 1989) (holding that Rule 408 applies in a criminal proceeding as well as a civil proceeding to bar evidence of a settlement agreement). The Fourth Circuit and the D.C. Circuit have suggested in dicta that Rule 408 may apply in a criminal proceeding. See United States v. Graham, 91 F.3d 213, 218 (D.C. Cir. 1996) ("The subject of [Rule 408] is the admissibility of evidence (in a civil or criminal case) of negotiations undertaken to 'compromise a claim.'"); United States v. Peed, 714 F.2d 7, 9-10 (4th Cir. 1983) (noting that defendant characterized certain statements as "an offer to compromise a civil claim, which under Fed. R. Evid. 408 cannot be introduced [in the criminal proceeding before it] as evidence of liability"); see also United States v. Skeddle, 176 F.R.D. 254, 256 (N.D. Ohio

-23-

1997) (disagreeing with government's argument that Rule 408 does not apply in criminal proceedings, noting that "[n]othing in Rule 408 limits its application to civil litigation that was preceded by or included settlement negotiations"); State v. Gano, 988 P.2d 1153, 1159-60 (Haw. 1999) (discussing cases and concluding that "Rule 408 does apply in criminal proceedings").

Commentators are divided on the point, although a majority appear to agree with the Fifth Circuit's position that Rule 408 should bar evidence of settlements in both civil and criminal proceedings. See, e.g., 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.08[6] (2d ed. 1997) (stating that evidence of settlement should be barred in both criminal and civil proceedings); 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5308 (Supp. 2002) ("Rule 408 would make covered compromise evidence inadmissible in criminal as well as civil proceedings."); John W. Strong, McCormick on Evidence § 266 (5th ed. 1999) ("If the transaction on which the prosecution is based also gives rise to a civil cause of action, a compromise or offer of compromise to the civil claim should be privileged when offered at the criminal trial if no agreement to stifle the criminal prosecution was involved."); Todd W. Blanche, When Two Worlds Collide: Examining the Second Circuit's Reasoning in Admitting Evidence of Civil Settlements in Criminal Trials, 67 Brook. L. Rev. 527, 528 (2001) (noting that "[m]ost other courts and leading

evidence treatises conclude that settlements and negotiations should be protected under Rule 408 not only in civil trials, but also in criminal proceedings").

The Sixth, Seventh and Second circuits have relied upon what they call the "plain language" of the Rule as well as "the primary policy consideration that underlies the purpose of Rule 408" to find it applicable only to civil proceedings. Logan, 250 F.3d at 367. Thus, "words such as 'validity' and 'claim' establish that the drafters of the Rule intended for it to apply solely in a civil context." Id. (discussing United States v. Baker, 926 F.2d 179, 180 (2d Cir. 1991)); see also Prewitt, 34 F.3d at 439 ("The clear reading of this rule suggests that it should apply only to civil proceedings, specifically the language concerning validity and amount of a claim."). Additionally, those courts conclude that the policy considerations underlying Rule 408—to encourage the settlement of civil cases—either has no application to criminal cases, or is "heavily outweighed by the public interest in prosecuting criminal matters." Logan, 250 F.3d at 367.

On the other hand, those courts and commentators who conclude that Rule 408 should apply in both civil and criminal proceedings to bar evidence of settlements also rely on the language of Rule 408 and the Rules of Evidence generally, as well as the dramatic effect evidence of an admission of liability could have upon a criminal defendant. Thus, "Rule 1101(b) explicitly states that the rules of evidence 'apply generally' to criminal cases and criminal

-25-

proceedings." Skeddle , 176 F.R.D. at 256. Further, nothing in the language of the Rule explicitly excludes its application to criminal proceedings.

Additionally, Rule 408 specifically states that it "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408. Courts approving Rule 408's application in criminal proceedings note that "[t]o construe the rule as applying only in civil proceedings would render the final sentence of the rule unnecessary." Gano, 988 P.2d at 1159; see also Skeddle , 176 F.R.D. at 257 (noting its "agree[ment] with defendants that if Rule 408 did not apply in criminal cases, there would be no need to carve out an exception for certain circumstances in criminal cases"). Finally, those courts cite other powerful policy concerns suggesting that Rule 408 should bar settlement evidence in criminal cases: "It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have paid the money back." Hays , 872 F.2d at 589; Gano, 988 P.2d at 1159 ("[W]e believe that the potential impact of evidence regarding a civil settlement agreement is even more profound in criminal proceedings than it is in civil proceedings.").

Although the question is a very close one, we agree with those courts which apply Rule 408 to bar settlement evidence in both criminal and civil proceedings. We reach this conclusion for essentially the same reasons stated by those courts: the Federal Rules of Evidence apply generally to both civil and criminal proceedings; nothing in Rule 408 explicitly states that it is inapplicable to criminal proceedings; [6] the final sentence is arguably unnecessary if the Rule does not apply to criminal proceedings at all; and the potential prejudicial effect of the admission of evidence of a settlement can be more devastating to a criminal defendant than to a civil litigant.

Having concluded that it was error to admit evidence of the settlement, we must determine whether it was plain error, which requires a finding that the error affected substantial rights by "affect[ing] the outcome of the trial." Haney, 318 F.3d at 1166. We conclude that it did not. There was ample other evidence establishing the substance of what Wilgers testified the settlement agreement contained—that Bailey had knowingly and intentionally taken money from the

_____

[6]As the district court in Skeddle pointed out, the drafters of the Rules knew how to expressly exclude criminal proceedings from the Rules' application when they wanted to: "Rule 803(8)(b) provides that public records are not to be excluded as hearsay when setting forth matters observed pursuant to a duty imposed by law, except 'in criminal cases [involving] matters observed by police officers and other law enforcement personnel.'" Skeddle, 176 F.R.D. at 257 (quoting Fed. R. Evid. 803(8)(B)). We must assume that the drafters' failure to make any express exclusion in 408 for criminal proceedings was meaningful.

-27-

Partnership accounts and placed it in his own account, in contravention of the Partnership Agreement; that the partners did not give him permission to do that; and that he had withdrawn in excess of $1 million without authorization from the partnership. Moreover, the testimony did not indicate that Bailey was "furnishing or offering or promising to furnish . . . a valuable consideration" under Rule 408. It simply recounted Bailey's conduct in connection with the Partnership. While evidence that Bailey had admitted such conduct in the civil settlement added to the body of evidence before the jury about Bailey's conduct, it did not affect the outcome of the trial.

## VII. Application of the Sentencing Guidelines

The district court sentenced Bailey to 57 months' imprisonment. Bailey argues the court erred in its calculation of loss, its application of the abuse-of-trust enhancement, and in its refusal to grant a two-level reduction for acceptance of responsibility. "We review a district court's interpretation of the Sentencing Guidelines de novo, and its factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." United States v. Brown, 314 F.3d 1216, 1222 (10th Cir. 2003).

## A. Amount of Loss

The district court determined that the amount of loss attributable to Bailey's fraudulent scheme was $951,759.05. The guidelines state that "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." USSG §2B1.1, comment. (n.2(C)). The guidelines further provide that the loss "shall be reduced by . . . [t]he money returned . . . by the defendant . . . to the victim before the offense was detected." USSG §2B1.1, comment. (n.2(E)). Bailey argues that the amount of loss should have been reduced by the $600,000 he borrowed from his parents and put into the Partnership accounts.

The district court made the following findings with respect to that $600,000:

> Although defendant's exhibit B shows $600,000 wired from defendant's account to partnership accounts, there is no evidence that all of those funds were actually given 'to the victim[s]' before his crimes were detected. After reinvesting the funds in partnership accounts, defendant apparently lost substantial sums before the victims received any benefit from defendant's cash infusion. The court has been provided with no means to track the infused funds after they were reinvested to sufficiently credit them against losses sustained. Ultimately, only $369,676.32 remained in the partnership account at the time it was dissolved. Although it might be argued that the investors benefitted from defendant's cash infusion to the extent that, without it, no money would have been left in the partnership account upon dissolution, there is no evidence by which a dollar amount of the benefit "to the victims" can be determined. The

fact remains that defendant did not return any money directly to his investors before his offenses were detected.

Memorandum and Order at 7-8, App. Vol. I at 223-24. Those findings are not clearly erroneous. Giving appropriate deference to the district court's application of the guidelines to the facts, we affirm its determination of the amount of loss.


### B. Abuse of Trust Enhancement

The district court enhanced Bailey's sentence by two points for abuse of a position of trust under USSG §3B1.3. Applying the standard of review set out above, we affirm the district court's enhancement of Bailey's sentence for abuse of a position of trust.

As the district court noted, the application notes to the guidelines specifically provide that the abuse-of-trust enhancement applies where a defendant holds himself out to be a legitimate investment broker as a part of a scheme to defraud:

> This adjustment . . . applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not. For example, the adjustment applies in the case of a defendant who (A) perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker.

USSG §3B1.3. comment. (n.2).    See United States v. Queen, 4 F.3d 925, 929 n.3 (10th Cir. 1993) ("To invoke §3B1.3, the defendant must either occupy a formal

*position* of trust or must create sufficient indicia that he occupies such a position of trust that he should be held accountable as if he did occupy such a position."). Bailey argues that he "never held himself out to his investors as anything more than an unlicenced, unregistered, amateur, experimental investor." Appellant's Br. at 58. We disagree. We affirm the district court's finding, after its careful review of the evidence in this case, that Bailey clearly held himself out to be a legitimate investment broker and accordingly abused a position of trust under §3B1.3.

### C. Acceptance of Responsibility

Finally, Bailey argues the district court erred in refusing to grant him a sentence reduction for acceptance of responsibility. "The district court's acceptance of responsibility determination is subject to the clearly erroneous standard of review." United States v. Quarrell, 310 F.3d 664, 682 (10th Cir. 2002). Further, "[b]ecause the 'sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility,' his or her decision is 'entitled to great deference on review.'" Id. (quoting USSG §3E1.1, comment. (n.5)). Bailey bears the burden of proving acceptance of responsibility. Id. "In 'rare situations' a defendant may receive credit for acceptance of responsibility even though he exercised his right to a trial." Id.

We agree with the district court's assessment that "[t]he overall tenor of this case at trial was that, although defendant committed the acts, he actively denied any intent to defraud."  Memorandum and Order at 12-13, App. Vol. I at 228-29.  Bailey repeatedly asserted he may have made some mistakes, failed to keep accurate records, perhaps was sloppy, and continued to claim that at least some of his partners actually encouraged him to invest in futures.  Bailey never admitted that he had any intent to defraud, nor did he acknowledge that his actions were criminal.  We affirm the district court's finding that "there is absolutely no indication here that defendant accepted responsibility for any criminal conduct prior to trial, or after, for that matter."  Id. at 230.  See United States v. Hill , 197 F.3d 436, 446-47 (10th Cir. 1999) (affirming denial of acceptance of responsibility reduction where defendant argued "that his conduct was innocent and without intention to defraud" victim).  We therefore affirm the court's refusal to grant Bailey a reduction for acceptance of responsibility.

## CONCLUSION

For the foregoing reasons, we AFFIRM Bailey's conviction and sentence.